# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 67  SSM 8
Jesse Cole,
        Respondent,
    v.
Samantha Cole,
        Appellant.

Submitted by Annette G. Hasapidis, for appellant.
Submitted by Carol Lipton, for respondent.
Submitted by Ronna L. DeLoe, attorney for the children.

MEMORANDUM:

The order of the Appellate Division should be affirmed, with costs.

Defendant failed to preserve her arguments regarding Domestic Relations Law § 240 (1) (a). As a result, the parties never litigated, and Supreme Court did not pass upon,

or make any findings with respect to, whether a withdrawn family offense petition constitutes "a sworn petition" for purposes of this statute or whether defendant proved allegations of domestic violence "by a preponderance of the evidence" (Domestic Relations Law § 240 [1] [a]) – issues that are essential to the arguments defendant now raises. Record evidence supports the affirmed custody award.

Defendant's remaining arguments are either unpreserved or without merit.

Cole v Cole

SSM No. 8

RIVERA, J. (dissenting):

When a party in a custody dispute "alleges in a sworn . . . pleading that the other party has committed an act of domestic violence against the party making the allegation . . . and such allegations are proven by a preponderance of the evidence," Domestic Relations Law § 240 (1) (a) requires the court to "consider the effect of such domestic

- 1 -

violence upon the best interests of the child" and to state its conclusions "on the record."

Here, defendant mother challenges an award of custody to plaintiff father, arguing Supreme

Court failed to consider her allegations of domestic violence. In father's underlying

divorce action, the court admitted into evidence mother's family offense petition alleging

father's abuse during their relationship, as well as mother's testimony describing specific

incidences of father's violence and additional corroborating evidence. Mother thus

preserved her claim that the court failed to consider the effects of domestic violence on the

best interests of their two young children in granting father primary physical custody, as

required by Domestic Relations Law § 240 (1) (a).

Because the issue is preserved, I would reverse and remit to Supreme Court for a

new best interest of the child analysis consistent with the framework of Domestic Relations

Law § 240 (1) (a), and any development of the record as needed.


I.

Domestic violence continues to plague society, and is a persistent threat to

individual safety, family wellbeing, and the public welfare. Its impact is national in scope:

over 1/3 of women in the United States will experience violence in their lifetime from their

intimate partner (National Center for Injury Prevention and Control, The National Intimate

Partner and Sexual Violence Survey: 2010 Summary Report, at 38 [2010] [finding 35.6%

of U.S. women experience rape, physical violence, or stalking by their intimate partners

during their lifetimes, including 5.9% in the past year]). Despite research, public

education, advocacy, and legislative initiatives intended to address abuse by former and

current intimate partners this type of violence continues to affect members of all our diverse communities (see e.g. Violence Against Women Act of 1994, 34 USC § 12301 et seq., as added by Pub L 103-322, Title IV; L 1992, ch 463 [creating New York State Office for the Prevention of Domestic Violence; Bureau of Justice Statistics, Family Violence Statistics: Including Statistics on Strangers and Acquaintances, at 10-11 [2005] [discussing widespread incidence of domestic violence across age, race, and gender lines]).  Reports of an increase in domestic violence incidences in New York under the shelter-at-home directives for the novel coronavirus public health emergency have reminded all of us of the dangers faced by survivors and their families and the need to eliminate structural impediments to social services and legal assistance for survivors (see New York State Council on Women and Girls, Covid-19 Domestic Violence Task Force Recommendations, at 1 [2020]).

Today, we have a greater understanding of the dynamics of abusive relationships, and how institutional gender bias heightens the barriers that survivors of domestic violence face, increasing the risk of harm to them and their children.  Increased appreciation and concern for the challenges faced by survivors comes after decades of advocacy demanding, among other things, a change in the culture of law enforcement and just treatment in the courts (see e.g. Elizabeth M. Schneider, Domestic Violence Law Reform In The Twenty-First Century: Looking Back And Looking Forward, 42 Fam L Q 353 [2008]; Susan Schechter et al., Effective Intervention In Domestic Violence & Child Maltreatment Cases: Guidelines for Policy and Practice: Recommendations from the National Council of Juvenile & Family Court Judges Family Violence Department [1999]).  Recently, in an

impressive demonstration of organizing, the Me Too Movement has effectively used social media to call for change and engage survivors of sexual violence at unprecedented levels (see e.g. Anna Codrea-Rado, #MeToo Floods Social Media With Stories of Harassment and Assault, NY Times [Oct 16, 2017], https://www.nytimes.com/2017/10/16/technology/metoo-twitter-facebook.html; Lesley Wexler et al, #MeToo, Time's Up, and Theories of Justice, 2019 U Ill L Rev 45 [2019]; Jamillah Bowman Williams et al, #MeToo As Catalyst: A Glimpse Into 21st Century Activism, 2019 U Chi Legal F 371 [2019]).  Yet change in the legal culture has been slow. For example, while the majority of states now "require the trial judge to consider domestic violence as part of the best interest determination," "gender bias in the justice system" tends to result in "devaluation of domestic violence" in custody determinations (Dana Harrington Conner, Abuse and Discretion: Evaluating Judicial Discretion in Custody Cases Involving Violence Against Women, 17 Am U J Gender Soc Poly & L 163, 188-190 [2009]; Prentice L. White, You May Never See Your Child Again: Adjusting The Batterer's Visitation Rights To Protect Children From Future Abuse, 13 Am U J Gender Soc Poly & L 327, 330-331 [2005] [discussing courtroom dynamics that can lead courts to "misunderstand the abused mother"]; Joan S. Meier, Domestic Violence, Child Custody, And Child Protection: Understanding Judicial Resistance And Imagining The Solutions, 11 Am U J Gender Soc Poly & L 657 [2003] [discussing the tendency of courts to discount the accounts of victims of domestic violence and possible reasons for this tendency]; Lois A. Weithorn, Protecting Children From Exposure To Domestic Violence: The Use And Abuse Of Child Maltreatment, 53 Hastings L J 1 [2001]; Lynne R. Kurtz, Protecting New

York's Children: An Argument For the Creation of a Rebuttable Presumption Against Awarding a Spouse Abuser Custody of a Child, 60 Alb L R 1345 [1997]; Amy Haddix, Unseen Victims: Acknowledging the Effects of Domestic Violence On Children Through Statutory Termination of Parental Rights, 84 Calif L Rev 757 [1996]).

New York similarly has struggled with how to address domestic violence and the obstacles survivors face in the courts. Calls for institutional study with an eye towards systemic change have long come from members of New York's legal profession. Those calls led Chief Judge Cooke of the Court of Appeals to announce in 1984 the formation of the New York Task Force on Women in the Courts. The Task Force was authorized to "examine the courts and identify gender bias and, if found, make recommendations for its alleviation" (Report of the New York Task Force on Women in the Courts [hereinafter Task Force Report], 15 Fordham Urban L J 11, 16 [1986]).

In accordance with its broad mandate, in 1986, the Task Force issued a comprehensive report on the status of women in the legal system, including the treatment of women litigants and lawyers.[1] At the same time that the anti-domestic violence movement was growing in visibility and impact, the Task Force turned to the courts' response to violence against women (see generally Task Force on Domestic Violence, State of New York, Domestic Violence: Second Report to the Governor and the Legislature [Nov 1982]; Task Force Report, 15 Fordham Urban L J at 28-29 [discussing legislative response to domestic violence, including amendments to Article 8 of the Family Court Act "for the

---

[1] The report is an official report of the Unified Court System of the State of New York.

purpose of attempting to stop the violence, end the family disruption and obtain protection"], quoting FCA § 812 [b] [2]). The report concluded that "[j]udges, law enforcement officials and court personnel often misconceive the nature and effect of violence against women. Women's claims are too often met with incredulity or are ascribed to ulterior motives. The courts appear indifferent and women are denied effective relief" (Task Force Report, 15 Fordham Urban L J at 31). With respect to family court matters, the report further explained that "[j]udges making custody and visitation determinations too often fail to consider a man's violent conduct towards his wife and its well documented detrimental effect on children" (id. at 48; see id. at 40-43).[2] Among other things, the Task Force recommended that the legislature "[e]nact legislation that . . . [p]rovides that abuse of one's spouse is evidence of parental unfitness for custody and a basis for termination of visitation or a requirement of supervised visitation" (id. at 49).

The Task Force's findings led to changes in this State's judiciary. The Unified Court System created a Judicial Committee on Women in the Courts "to secure the equal

_____

[2] The reference to heterosexual couples reflects the language of that era (see generally Ruthann Robson, Lavender Bruises: Intra-Lesbian Violence, Law and Lesbian Legal Theory, 20 Golden Gate L Rev 567 [1990] [discussing "the confusion between sexuality and violence that confounds legal treatments of" violence between lesbians]). Times have changed. We are more likely today to use the inclusive term "gender-based violence," which includes a broader spectrum of partner violence, sexual violence (including trafficking), and violence against women as well as people who identify as women or are gender non-conforming (see Rhonda Copelon, Recognizing the Egregious in the Everyday: Domestic Violence As Torture, 25 Colum Hum Rts L Rev 291, 367 n 1 [1994]). The term recognizes the harm that gender-based violence does to everybody, including men and children. Our laws reflect this evolution in our societal views. For example, New York adopted marriage equality and our domestic violence laws apply to same sex couples (see Social Services Law § 459-a [2] [b]; Domestic Relations Law § 10-a).

justice, equal treatment, and equal opportunity that" the Task Force Report "found were

often denied women" (New York State Unified Court System, Judicial Committee on

Women in the Courts, http://ww2.nycourts.gov/ip/womeninthecourts/index.shtml [last

accessed June 15, 2020]).  New York now has specialized courts with expertise in domestic

violence matters (New York State Unified Court System, Domestic Violence (DV) &

Integrated Domestic Violence (IDV) Courts, http://ww2.nycourts.gov/Admin/OPP/dv-

idv/index.shtml [last accessed June 15, 2020]).

It took a decade, but the Task Force findings and recommended legislation also led

to the eventual amendment of the Domestic Relations Law and Family Court Act to ensure

that judicial custody and visitation determinations fully accounted for the effects of

domestic violence on children.  As relevant here, Domestic Relations Law § 240 (1) (a)

provides that,

> "[w]here either party to an action concerning custody of or a
> right to visitation with a child alleges in a sworn petition or
> complaint or sworn answer, cross-petition, counterclaim or
> other sworn responsive pleading that the other party has
> committed an act of domestic violence against the party
> making the allegation or a family or household member of
> either party, . . . and such allegations are proven by a
> preponderance of the evidence, the court must consider the
> effect of such domestic violence upon the best interests of the
> child, together with such other facts and circumstances as the
> court deems relevant in making a direction pursuant to this
> section and state on the record how such findings, facts and
> circumstances factored into the direction."

As the legislative history makes clear, this section was enacted based on the Task

Force's findings that judges were not properly considering allegations of domestic violence

in custody and visitation proceedings (see Memorandum of Support, Bill Jacket, L 1996,

ch 85 at 1). Relying on the Task Force Report and additional research, the Assembly's Memorandum of Support found that "judges too often disregard a father's violence against a mother and award joint or sole custody to abusive fathers" (id.). This was because "[j]udges erroneously assume that the beating of a child's parent is not a detriment to the child or that the problem will end upon separation or divorce" (id., citing Keenan, Domestic Violence and Custody Litigation: The Need for Statutory Reform, 13 Hofstra L Rev 407, 410 [1985]). Rather, abuse by a spouse "injures children both directly and indirectly" and is "a form of non-physical child abuse" (id.). In fact, "[a]buse of a parent is detrimental to children regardless of whether the children are physically abused themselves or whether they actually witness the violence to the parent." The legislature further noted that "children raised in a violent home have reactions of shock, fear and guilt," and "have impaired self-esteem and developmental and socialization difficulties" (id. at 1-2, citing Bonnie Westra and Harold Martin, Children of Battered Women, 10 Maternal-Child Nursing J 41, 49 [1981]).[3] It is in neither a child's nor society's best interest for the child to be placed with a perpetrator of domestic abuse because to do so exposes the child to an increased risk of being directly abused, and it can perpetuate "the cyclical nature of family violence": "[c]hildren who are raised in violent homes learn to use physical violence as an outlet for anger and are more likely to use violence to resolve conflicts" (id. at 2). The

---

[3] Some more recent decisions from this State's courts do not appear to consider this reality (see e.g. In re Daphne G., 308 AD2d 132, 134 [1st Dept 2003] [holding that "(t)he father's assault of the mother in the child's absence does not, by itself, expose the child to a substantial risk of harm so as to constitute proof of neglect"]; but see id. at 136-137 [Ellerin, J., dissenting] [discussing research showing that "domestic violence may harm a child who does not personally witness it"]).

legislature also sought to respond to a recent case in which the Appellate Division reversed a Family Court order that had awarded primary physical custody to a father specifically *because* the mother was in a battered women's shelter, and purportedly did not have enough space for the couple's children (id. at 1, citing Blake v Blake, 106 AD2d 916 [4th Dept 1984]). Accordingly, the legislature determined that it would respond to the Task Force recommendations by mandating consideration of domestic violence in custody determinations (id. at 3).[4] Prior to this legislation, New York was among a small minority of states that did not statutorily mandate consideration of domestic violence in custody determinations (see Bill Jacket, L 1996, ch 85, at 28, 29, 31).

The language enacted does not specifically say whether domestic violence allegations must be made and proven in the custody action itself or in any sworn statement. The legislature was aware of this very issue, as the Department of Social Services noted the same (see id. at 18-19). Thus, the legislature, in line with its policy concerns, must have intended a broad interpretation of the statute's coverage. Otherwise, the legislature would have included appropriate language to limit the application of the section to allegations made in *the* sworn pleadings in the instant action, rather than "a" sworn pleading (Town of Aurora v Village of E. Aurora, 32 NY3d 366, 379 [2018] ["what is omitted or not included in a statute was intended by the legislature to be omitted or

---

[4] At the time, some stakeholders, while supporting the legislation, thought it did not go far enough. They advocated for a presumption against an award of custody to perpetrators of domestic violence (see Letter of Support from New York State Executive Department, Division for Youth, Bill Jacket, L 1996, ch 85 at 21; Letter from Association of the Bar of the City of New York, L 1996, ch 85 at 27).

excluded"] [internal quotation marks omitted]; SIN, Inc. v Department of Fin. Of City of New York, 71 NY2d 616, 621 [1988] [holding that where legislature did not choose to use "words or limitation or modification," court presumes language is intended to "be given its full significance"]; McKinney's Cons Laws of NY, Book 1, Statutes § 114 [same]; see also McKinney's Cons Laws of NY, Book 1, Statutes § 321 ["Generally, remedial statutes are liberally construed to carry out the reforms intended and to promote justice"]).

The legislative history also includes statements approving the requirement that the allegations be proven by a preponderance of the evidence because this threshold burden would minimize the risk of unsubstantiated claims of abuse. The standard "simply requires [that] the trier of fact . . . believe that the existence of a fact is more probable than its nonexistence before [the trier of fact] may find in favor of the party who has the burden to persuade the [trier of fact] of the fact's existence" (Concrete Pipe and Prods. of Calif., Inc. v Construction Laborers Pension Trust for S. Calif., 508 US 602, 622 [1993] [internal quotation marks omitted]; accord Matter of Beautisha B., 115 AD3d 854, 854 [2d Dept 2014]; Matter of Nathaniel II., 18 AD3d 1038, 1038-1039 [3d Dept 2005]; 2 Robert P. Mosteller et al., McCormick on Evid. § 339 [8th ed, Jan 2020 update]).

In sum, any sworn statement in one of the listed documents satisfies the first prong of Domestic Relations Law § 240 (1) (a) that an allegation of abuse be made by one party to an action concerning custody or visitation. The court must then address the second prong and determine whether the allegations have previously been proven, or are proven in the pending action, by a preponderance of the evidence. Logically, this includes explaining if the party failed to satisfy the burden of proof. But if the allegations are substantiated, the

court must consider them in making its determination, which under well-established law, requires the court consider the abuse as a factor in deciding what is in the best interests of the children (see S.L. v J.R., 27 NY3d 558, 562 [2016] ["in assessing questions of child custody, courts must 'make every effort to determine what is for the best interest of the child, and what will best promote its welfare and happiness'"], quoting Eschbach v Eschbach, 56 NY2d 167, 171 [1982]).


                                                    II.

At the bench trial on father's action for divorce seeking custody of their two young children, the court admitted into evidence a family offense petition mother filed against father, in which she made sworn allegations of domestic violence. Mother testified in the divorce action that after obtaining an order of protection against father, she withdrew the petition without prejudice in exchange for father's agreement to voluntarily leave the marital residence. Mother further testified about the alleged domestic abuse. When father sought to limit her testimony to the statements in the family offense petition, the Attorney for the Child argued to the court that "[w]e all know that domestic violence is an element to be used in the determination of the best interests of the children," and that "it would be a travesty" if the evidence was not admitted. The court admitted mother's testimony, along with supporting evidence. Father did not present evidence contradicting mother's testimony.

Supreme Court awarded the parties joint legal custody and awarded primary physical custody of the young children to father, concluding it was in the best interests of the children for father to have physical custody largely because "the children ha[d] expressed a firm preference for residing with" father, based on "reasons [that were] germane and [were] supported by evidence of record." The Court made no findings of domestic violence or a lack of proof on the issue, nor did it so much as mention mother's allegations and render a credibility determination.

The Appellate Division affirmed, in an order that does not address mother's Domestic Relations Law 240 (1) (a) claims,[5] and similarly lacks discussion of her domestic violence allegations (172 AD3d 680 [2d Dept 2019]). We granted leave (34 NY3d 905 [2019]) and mother now renews her allegations that Supreme Court's decision fails to comport with the Domestic Relations Law.

III.

Mother made a sworn allegation in the family offense petition that father committed acts of violence against her. Thereafter, the petition was admitted into evidence at father's divorce proceeding in which he sought custody of their children. She further testified to the alleged abuse and provided additional evidence to corroborate her allegations. Other than noting that mother withdrew the petition, father did not controvert her claims in any

---

[5] The Appellate Division's sole statutory reference is Domestic Relations Law § 240 (1-b) (c) (5), concerning the parties' pro rata contributions to the children's future unreimbursed health care expenses.

way.  Accordingly, under Domestic Relations Law § 240 (1) (a), the court was required to consider mother's allegations to determine whether she established them by a preponderance of the evidence.  However, because the court's decision makes no mention of those allegations, the record does not permit us to determine whether, as mother claims on appeal, the court failed to comply with its statutory mandate.  Under the circumstances, the proper course is to reverse and remit to that court to make a record as to whether mother has established father's domestic violence by a preponderance of the evidence, and if so, then "the court must consider the effect of such domestic violence upon the best interests of the child[ren], together which such other facts and circumstances as the court deems relevant in making a direction . . . and state on the record how such finding, facts and circumstances factored into the direction" (Domestic Relations Law § 240 [1] [A]).

The majority erroneously concludes that mother did not preserve her claims.  In general, "[t]o preserve an argument for review by this Court, a party must 'raise the specific argument' in Supreme Court 'and ask the court to conduct that analysis' in the first instance" (U.S. Bank N.A. v DLJ Mtge. Capital, Inc., 33 NY3d 84, 89, [2019], quoting Matter of New York City Asbestos Litig., 27 NY3d 1172, 1176 [2016]).  That said, "a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless" (CPL 470.05 [2]).

As the discussion above illustrates, the court was presented with sworn allegations of father's domestic violence, thus triggering the court's obligation under Domestic

Relations Law § 240 (1) (a) to consider whether the allegations were proved by a preponderance of the evidence. The statute gives no indication but that it is self-executing—that it operates, like any other procedural rule, without the need for a party to parrot its language to the trial court. Further, there is no credible argument that the court was unaware that domestic violence is a statutorily prescribed factor in its best interest of the children analysis, given that this standard is well-established; Domestic Relations Law § 240 (1) (a) is almost 25 years old; domestic violence is now commonly understood as negatively impacting children; and the obvious purpose of mother's testimonial and other evidence, which further supported the sworn statements in the family offense petition, was for the court to consider the alleged domestic violence in making its custody determination. Anyway, even if our rules of preservation were interpreted—in contravention of our caselaw—to impose the onerous requirement of an on-the-record assertion at trial that this standard applies, the Attorney for the Children made that same argument, saying outright that "[w]e all know that domestic violence is an element to be used in the determination of the best interests of the children."

Our preservation rules require only that a party raise their claim at the first opportunity, which in this case was before the Appellate Division, after the trial court issued its custody determination.[6] Mother did just that, arguing on appeal that the trial court failed to properly consider her allegations of domestic violence in its best interest of

_____

[6] Mother argued to the Appellate Division that the trial court issued its decision on the custody issue on August 8, 2017, a full week before the August 15 deadline for post-trial memoranda that it set at the conclusion of trial. The majority fails to take this into account in applying its novel and harsh preservation rule.

the children analysis, that she had proved the allegations by a preponderance of the evidence and that father did not admit evidence to controvert her allegations of abuse.

Notably, everyone appearing before us—mother, father, and the Attorney for the Children (who argues in support of reversal based, in part, on the court's failure to consider the domestic violence allegations)—assumes mother's claim is properly before this Court. Indeed, father argues only that mother failed to establish her domestic violence allegations by a preponderance of the evidence, not that those allegations were not presented at trial. There simply is no preservation bar to mother's assertions on this appeal. By way of comparison and clarification, there would be a preservation problem if on this appeal father interposed a challenge to the application of Domestic Relations Law § 240(1)(a). He makes no such claim and it would not be reviewable if he did, because at trial, he conceded that mother could testify as to her allegations in the family offense petition, a document he had successfully moved to admit into evidence in his case-in-chief. He also did not object when the Attorney For the Children argued that the court was obligated to consider mother's allegations as part of its best interests of the children analysis.

The majority holding burdens survivors of domestic violence with a preservation rule that is contrary to law and serves no practical purpose. While our task is to ensure the intent of the legislature is given effect, the majority's rule undermines the statutory mandate that judges properly consider allegations of abuse proven by a preponderance of the evidence, and the effect of domestic violence on a child, when deciding custody and visitation. In accordance with that mandate, if a court concludes the allegations are not sufficiently proven, the court must say so, but it cannot, as here, refrain from addressing

the issue at all.  The whole point of Domestic Relations Law § 240 (1) (a) is to ensure custody and visitation determinations are well-informed and guided by society's understanding of the impact of domestic violence on a child placed in the care of an abusive parent, by requiring judicial consideration of domestic violence allegations.  Affirming on this silent record does little to further that goal.  Unfortunately, due to the majority decision here, legislative action to reinstate the court's obligations is the only recourse to ensure survivors are heard.

For the reasons I have discussed, I would reverse and remit to Supreme Court for further proceedings in accordance with the Domestic Relations Law as described herein.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

On review of submissions pursuant to section 500.11 of the Rules, order affirmed, with costs, in a memorandum.  Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur.  Judge Rivera dissents in an opinion, in which Judge Wilson concurs.

Decided June 23, 2020